FILED

MAY 27 2005

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

1

UNITED STATES BANKRUPTCY COURT

2

EASTERN DISTRICT OF CALIFORNIA

3

4   In re:                              )        Case No. 04-26169-C-11
                                        )
5   INDIAN SPRINGS VINEYARDS,           )        DC No. SPB-1
                                        )
6                                       )
                    Debtor(s).          )
7   _____ )

8               **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

9        These findings of fact and conclusions of law address the

10  request of Abundant Real Estate, Inc. ("ARE") for payment of real

11  estate commissions as an administrative claim to be paid out of

12  escrow of certain real property.  Proceedings were held on April

13  19, 2005, April 26, 2005, and May 24, 2005.  The material facts are

14  not in dispute.  Accordingly, no trial-type hearing is necessary.

15  Moreover, the parties have agreed to admission of evidence without

16  live testimony and cross-examination.

17

18                        <u>FINDINGS OF FACT</u>

19       This chapter 11 bankruptcy case was filed on June 15, 2004, by

20  Indian Springs Vineyards.  Indian Springs Vineyards was attempting

21  to reorganize its business, which involved the operation of a

22  vineyard property of approximately 446 acres, in which

23  approximately 225 acres were in grape production located at 16110

24  Indian Springs Road, Penn Valley, CA 95946.

25       At the time the bankruptcy case was filed, the book value of

26  the property was scheduled in the bankruptcy schedules at

27  $5,530,100.00, subject to secured claims totaling $7,907,390.23.

28  The principal secured creditors were Aegon USA Realty Advisors,

Inc. ("Aegon"), which was listed with having a disputed secured

claim of $3,898,750.23, and Premier West Bank, having a disputed secured claim of $4,008,640.00.

The debtor operated as a debtor in possession.

As is typical in this type of chapter 11 reorganization case, the debtor's strategy was to attempt to continue operating the business while looking for a solution in the form of a purchaser who could rescue the situation or some other means of mollifying the creditors whose pressure precipitated the filing.

There was extensive litigation from the outset among the debtor and the secured creditors, particularly Premier West Bank, in which the creditors were reluctant to permit the 2004 grape crop to be cultivated and harvested (with limited exceptions).

As part of the debtor's strategy, the managing partner of the debtor in possession, Dennis Ball, executed a Non-Residential, Residential Income and Vacant Land Listing Agreement with ARE with an exclusive listing agreement to begin on July 2, 2004, and to end at 11:59 p.m. on August 2, 2004, at a price of $12,000,000.00 with compensation to the broker at 6 percent.

The agreement provided that the listing would not be entered in the multiple listing service and that no for sale or sold sign could be placed on the property.

On July 15, 2004, there was filed an ex parte application to employ ARE. The application referred to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014. The parties agreed to a 6 percent commission fee and reported that "ARE understands that its compensation is subject to court approval and may be changed by the Court." The relief sought was to "employ Abundant Real Estate, Inc. as a professional pursuant to 11 U.S.C. section 327 to assist

- 2 -

the Debtor and this bankruptcy estate in the listing, marketing,
and possibly selling of the Property pursuant to the terms set
forth in this Application."  The application to employ did not make
any reference to 11 U.S.C. § 328.

In support of the application, there was filed a declaration
of Yolanda MacDonald representing that she is an independent real
estate agent, employed with ARE and that she had agreed to provide
services on behalf of ARE for a 6 percent commission.  She also
stated in her declaration that:

> I believe the rate of commission requested by ARE in this
> proceeding is reasonable and comparable to other commission
> fees charged and paid, if not less, in this local area for the
> sale of residential real property.  I understand that any
> commission fee paid to ARE is subject to Court approval and
> change.

Declaration of Yolanda MacDonald at page 1, line 27, through page
2, line 3 (emphasis supplied).

There was also filed in support of the application a
declaration of Dennis Ball asserting that it was appropriate to
"list, market and possibly sell" the vineyard property.  He also
declared that "ARE has been informed that its commission fee is
subject to prior Court approval and may be modified by the Court."
Declaration of Dennis Ball at page 2.  Neither the declaration of
Ms. MacDonald nor Mr. Ball refers to § 328.

On July 16, 2004, this court signed and entered an order on
the application to employ real estate broker, which order was
prepared by counsel for Indian Springs Vineyards, and which stated
that "the Debtor is authorized to employ Advantage [sic] Real
Estate, Inc. as real estate professionals for the purposes of
listing, marketing, and selling real property of the estate located

- 3 -

at 12600 Indian Springs Road, Penn Valley, California 95946, pursuant to the terms and conditions set forth in the Application and supporting declarations of Dennis W. Ball and Yolanda Macdonald."  In addition, that order stated that "all compensation to be paid to Advantage [sic] Real Estate, Inc. shall be subject to Court approval, pursuant to 11 U.S.C. sections 328, 330, and 331."

On July 20, 2004, Premier West Bank objected to the application to employ the real estate broker on the basis that the listing price was so high that it would be unproductive in generating potential sales and that declining to enter the property in the multiple listing service would diminish sales potential.

On August 2, 2004, ARE and Mr. Ball executed an addendum to the listing agreement extending the agreement from August 2, 2004, to September 1, 2004.  No court approval was sought or obtained.

On July 8, 2004, Ms. MacDonald showed the property to representatives of Catlin Properties.  On July 23, 2004, Ms. MacDonald delivered a letter of intent from Catlin Properties to the debtor regarding the purchase of the property.  During the period from July 23, 2004, until March 10, 2005, there was a considerable amount of litigation activity regarding the operation and management of the vineyard and an attempt to construct a plan of reorganization.  During that period, Catlin Properties emerged and disappeared from the scene on multiple occasions.  The basic problem was that the secured creditors were not satisfied that any transaction that was being proposed to them under various reorganization options would pay them their secured claims in full.

During hearings in the fall of 2004, this court indicated that the original Catlin Properties proposal, which was substantially in

- 4 -

excess of $7,000,000.00, appeared to be "illusory" in light of various due diligence periods, conditions, and minimum deposits.

Eventually, there was a complex settlement among the secured parties and the debtor that permitted the closing of a transaction by which the property would be sold to Catlin Properties for the sum of $5,750,000.00.  This transaction required that Premier West Bank agree to reduce its claim by a substantial amount contingent upon prompt closing of escrow.  Specifically, Premier West Bank would be paid $2,175,000.00 from the sale escrow no later than March 10, 2005, and that if payment was not made, Premier West Bank was not bound by the settlement terms and "could obtains its claims against the estate."  In other words, Premier West Bank was willing to take a so-called "haircut" of at least $1,825,000.00 if it was actually paid by April 25, 2005, otherwise the sale transaction would collapse and a trustee (either chapter 11 or 7) would be appointed, with a possible consequence that the business would be closed and the real property abandoned to the secured creditors.

On April 1, 2005, ARE, represented by Stanley Berman, filed a request for payment of its commission out of the escrow and asserted that it was entitled to a priority contingent lien that had to be paid immediately upon closing.  Mr. Berman set a hearing for April 19, 2005, in this court under the court's self-set calendar rule on this motion SPB-1.

On April 18, 2005, Premier West Bank filed an objection to the request of ARE for payment of administrative claims asserting that there was no lien available under bankruptcy or nonbankruptcy law and pointing out that the "settlement" would collapse if the April 25 deadline was not honored.

On April 19, 2005, Mr. Berman also asked this court to enjoin the sale.  The court advised Mr. Berman that if ARE wished to enjoin the sale, it should commence an adversary proceeding. The hearing on motion SPB-1 was continued to April 26, 2005 (the day after the sale), at 9:30 a.m.

On April 22, 2005, ARE filed an adversary proceeding seeking, among other things, an order enjoining the close of escrow of the sale.  An emergency hearing was held on April 22, 2005, in adversary proceeding No. 05-2156, in which there was vigorous opposition and argument that ARE was attempting to extort something to which it was not entitled.

At the April 22, 2005, hearing, the debtor filed a response in opposition in which it asserted that, despite this court's observations at the April 19, 2005, hearing that it had not yet determined the amount of ARE's commission, ARE had been continuing to attempt to force payment of $345,000 from the escrow and raised numerous other factual points.  Also on April 22, Premier West Bank opposed the effort to obtain an injunction and made clear that the sale would collapse if it did not occur on schedule.

This court denied the request to enjoin the close of escrow and authorized the sale to close without payment of the broker's claim or any commission claimed by ARE.  This determination was made without prejudice to any future determination of a claim for administrative expenses against the bankruptcy estate.  The sale closed as scheduled.  On May 3, 2005, ARE dismissed adversary proceeding No. 05-2156, with prejudice.

On May 24, 2005, there came on for hearing ARE's request for payment of expenses in which ARE contended it was entitled to

- 6 -

payment of a 6 percent commission, i.e. $345,000 (or 6 percent of $6,189,503.48 or 6 percent of $6,474,914.32, both numbers being drawn from the closing statements) and that under § 328 the amount could be changed only under the terms prescribed by § 328.

The debtor opposed the request for payment of administrative expenses. At the time of the hearing on May 24, the debtor presented evidence that Ms. MacDonald devoted no more than 25 hours to the transaction and that the purchaser was a sophisticated real estate entity that continually negotiated a complex transaction directly with the debtor after the listing expired. The debtor suggested that compensation be on an hourly basis but conceded during oral argument that a percentage rate of less than 6 percent may be appropriate.

The debtor also presented evidence (it was stipulated that the declaration evidence could be admitted) that on or about April 20, 2005, counsel for Premier West Bank contacted the debtor's counsel to report that Premier West Bank had received numerous calls at its Oregon office from the real estate broker insisting that her commission should be paid out of the escrow and that counsel for Premier West Bank had contacted Mr. Berman and voiced his opposition to such conduct. The court believes this testimonial evidence.

In addition, there was evidence (hearsay admitted without opposition) that the escrow officer informed counsel for the debtor on April 21, 2005, that she had received calls from the broker that "she would obtain a court order to do so." Declaration of Mike K. Nakagawa, filed May 10, 2005. The court believes this testimonial evidence.

<u>CONCLUSIONS OF LAW</u>

The first question is whether the 6 percent commission was authorized under § 328(a) in circumstances in which it could only be adjusted under the terms appearing in that section.

This court did not intend its order to invoke § 328 even though § 328 is referred to in the order in a manner that is ambiguous because it also refers to § 330 without referring to the limitations of § 328(a).

Accordingly, this court is not required to honor the 6 percent as a rate of compensation that could be adjusted only under the circumstances specified in that section.  (Although there is substantial argument available that the circumstances of the real estate professional launching litigation that threatened to destroy the transaction would satisfy those conditions, the court makes no determination at this time.)

The next question is what compensation is appropriate, all parties agreeing that some compensation is in order.  The evidence from Ms. MacDonald's testimony is that 6 percent is an appropriate rate for the sale of "residential real property," a proposition as to which the court has no qualms, although it does with some regularity see employment of real estate professionals at rates of less than 6 percent and is here dealing with nonresidential real property.

It is also a fact that the debtor agreed to a commission of 6 percent and that the debtor's most vigorous creditor, Premier West Bank, while dissatisfied with other aspects of the employment as articulated in its opposition filed after the court signed the order authorizing employment, did not quarrel with the proposed

- 8 -

rate of compensation.  Accordingly, even though the court is not required to award 6 percent under § 328, it is persuaded that it should authorize compensation measured by $345,000, minus certain offsets that remain to be determined.

Specifically, the activity of ARE in March and April 2005 was, if not worse, unjustified.  ARE visited unnecessary and inappropriate expense upon parties and the estate that should not be rewarded.  Counsel for secured parties were required to expend considerable time and expense in rescuing the transaction from the attempt of the real estate professional to preempt this court's right to determine administrative compensation and to assert a lien that is plainly not allowed under applicable law.  In the circumstances of this case, which had dubious reorganization prospects without the Premier West settlement, ARE seriously imperiled the transaction, which transaction the court had already suggested may have been the debtor's last chance before the case collapsed into liquidation and foreclosures.

Accordingly, the court will not be able to make a final determination of the appropriate administrative expense award for ARE until counsel for the debtor, for Premier West Bank, and for Aegon all provide to this court evidence establishing the total amount of all reasonable fees and expenses that resulted from the activities of the real estate professional during March, April, and May (May being in the aftermath of March and April).

Those amounts shall be established by way of declarations and appropriate memoranda explaining the various costs and may include the expense of preparing such declarations and memoranda.  Such declarations and memoranda shall be filed by June 27, 2005, and

oppositions, if any, shall be in writing filed within 15 days thereafter.  Responses, if any, may be counted in the chargeable expenses, and shall be filed 15 days thereafter.  The court shall conduct oral proceedings only if it believes that there are material disputes of a evidentiary nature.

The court anticipates awarding all such amounts that are ultimately established (including expenses of litigating fees) as reasonable as administrative expenses under § 330 (for debtor's counsel) and under § 503(b)(4) (for creditor's counsel).

An appropriate order shall issue.

Dated:  May 27, 2005.


_____
UNITED STATES BANKRUPTCY JUDGE

**CERTIFICATE OF SERVICE**

On the date indicated below, I served a true and correct copy(ies) of the attached document by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed and by depositing said envelope in the United States mail or by placing said copy(ies) into an interoffice delivery receptacle located in the Clerk's Office.

Mike K. Nakagawa
2151 River Plaza Dr #195
Sacramento, CA 95833

Law Office of Stanley P. Berman
202 North Pine Street
Nevada City, CA 95959

Hauser & Mouzes
P.O. Box 1397
Woodbridge, CA 95258-1397

Meegan, Hanschu & Kassenbrock
1545 River Park Dr., #550
Sacramento, CA 95815

Dated: 5/31/05

<u>DEPUTY CLERK</u>

- 11 -